**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KEVIN BLACKSHEAR,

Plaintiff,

v.

CAPTAIN WOODWARD, Captain-Hearing
Officer, Watertown Correctional Facility;
LIEUTENANT ZEHR, Lieutenant-Watch
Commander, Watertown Correctional
Facility; D. VENETTOZZI, Acting Director,
Special Housing Inmate Disciplinary
Program, NYS Department of Corrections
and Community Supervision,

Defendants,[1]

No. 13-CV-1165
(FJS/CFH)

---

**APPEARANCES:**

KEVIN BLACKSHEAR
Plaintiff Pro Se
11-B-0296
Hale Creek ASACTC
Post Office Box 950
Johnstown, New York 12095

HON. ERIC T. SCHNEIDERMAN
Attorney General for the
    State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**OF COUNSEL:**

ADELE M. TAYLOR-SCOTT, ESQ.
Assistant Attorney General

**CHRISTIAN F HUMMEL**
**U.S. MAGISTRATE JUDGE**

---

[1] By memorandum-decision and order dated November 14, 2013, defendant
Fischer was dismissed from this action. Dkt. No. 6.

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff <u>pro se</u> Kevin Blackshear ("Blackshear"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983. Compl. (Dkt. No. 1) at 1; Blackshear Resp. (Dkt. No. 22-1) at 1. Blackshear alleges that defendants Captain Woodward, Lieutenant Zehr, and Acting Director Venettozzi, employees of DOCCS, violated his rights under the Fourteenth Amendment. Compl. at 1; Blackshear Resp. at 1. Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Defs.' Mot. Summ. J. (Dkt. No. 16). Blackshear opposes the motion. Blackshear Resp. at 1. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

All facts are related in the light most favorable to Blackshear as the non-moving party. <u>See</u> subsection II(A) <u>infra</u>. At all relevant times, Blackshear was an inmate at Watertown Correctional Facility ("Watertown").

## A. Search and Investigation

On July 2, 2011, at Watertown, non-party Corrections Officer Maitland performed a routine search of Blackshear's bed area. Compl. at 2; Dkt. No. 16-3 at 30. Maitland discovered a gap in the cover of a heater located between Blackshear's locker and bed. Dkt. No. 16-3 at 30. Inside of this gap, Maitland reported finding toilet paper, which he

---

[2] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

removed.  Id.  Inside of the toilet paper was the finger of a latex glove, which contained

three additional latex glove fingers, additional toilet paper, and three orange pills, one in

each finger.  Id.  Non-party Nurse Hall identified these pills to Maitland as suboxone.  Id.

Maitland then issued Blackshear a Tier III misbehavior report, charging Blackshear with

possession of drugs in violation of § 113.25 of the State of New York Department of

Correctional Services Standards of Inmate Behavior.  Id.; Compl. at 2.

A contraband receipt was created for the suboxone, which was transferred from

Maitland to non-party Corrections Officer Kogut.  Dkt. No. 16-3 at 42.  Kogut arranged the

suboxone for non-party Sergeant Thomas to photograph and then placed the suboxone in

Watertown's contraband box.  Id.  Blackshear was taken to the Special Housing Unit

("SHU") per defendant Lieutenant Zehr's ("Zehr") authorization.[3]  Id. at 30.  Zehr later

requested that the suboxone be identified by Watertown's pharmacist, who visually

confirmed Nurse Hall's identification of suboxone.  Id. at 42.  In the early morning the next

day, July 3, 2011, Blackshear was provided with a copy of Maitland's report.  Compl. at 2.

Blackshear first met with his inmate assistant on July 5, 2011.  Compl. at 3; Dkt. No. 16-

3 at 37.  Blackshear indicated he did not wish to call any witnesses, but did request "DNA

testing on items" and "evidence from his inmate records."  Dkt. No. 16-3 at 37.  The same

day, Blackshear was provided with a copy of the photographs taken of the contraband.

Dkt. No. 16-3 at 37.; Compl. at 3.

---

[3]  SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the general
population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a
SHU as discipline, pending resolution of misconduct charges, for administrative or security
reasons, or in other circumstances as required.  Id. at pt. 301.

## B. Tier III Disciplinary Hearing

Blackshear's Tier III disciplinary hearing in connection with the July 2, 2011 misbehavior report commenced on July 6, 2011 before defendant Woodward, who would serve as hearing officer.  Compl. at 3; Tier III Hr'g Tr. (Dkt. No. 16-3 at 58–76) at 58.  Blackshear defended himself against the allegation by claiming that forty-six other men had access to his room, in addition to the four who lived with him.  Compl. at 4; Tier III Hr'g Tr. at 60–61.  Thus, many others had access to the area where Maitland found the suboxone.  Compl. at 4; Tier III Hr'g Tr. at 60–61.  Blackshear argued that he was not the one who placed the suboxone in the heater and that he was unfamiliar with suboxone.  Tier III Hr'g Tr. at 61–62.  Additionally, Blackshear contended that he did not receive access to all relevant documents.  Id. at 65–66; Compl. at 3–4.  Woodward then provided Blackshear with a copy of the pharmacist's report identifying the pills found in the heater as suboxone and Form 2080, which is the chain of custody form for the suboxone.  Compl. at 5; Tier III Hr'g Tr. at 65–66, 70.  Woodward adjourned the hearing to allow Blackshear time to review the documents he was provided.  Tier III Hr'g Tr. at 68.

The hearing recommenced on July 13, 2011.  Tier III Hr'g Tr. at 68.  Kogut testified that Thomas's name did not appear on Form 2080 because Thomas had never handled the suboxone.  Id. at 68–69.  Non-party Pharmacist Goodnough explained the visual process by which she identified the pills found as suboxone.  Id. at 71–72.  By comparing the markings and appearance of the pills found to the Physician's Desk Reference, Goodnough was able to confirm the pills as suboxone.  Id. at 42, 72.  Woodward then briefly adjourned the meeting to create a written disposition.  Id. at 73; Compl. at 6.  Woodward returned to read his disposition, which found Blackshear guilty of drug

possession and imposed penalties of three months in SHU, and three months loss of

recreation, packages, commissary, and phone use.  Compl. at 6; Tier III Hr'g Tr. at 73.  In

his decision, Woodward noted that he relied upon the following to make his conclusions:

the written report of non-party Maitland, the verbal testimonies of Blackshear and non-

parties Kogut and Goodnough, Form 2080, and the photograph of the suboxone.  Compl.

at 6; Tier III Hr'g Tr. at 73–74.

Blackshear made several allegations concerning the conditions of SHU confinement.

Compl. at 11.  Specifically, Blackshear alleges that he had limited privileges generally, was

confined in a small cell, was permitted only one hour of exercise a day in a small space,

and had limited interaction with correction officers.  See id.


## C.  Administrative Appeal

Blackshear appealed Woodward's determination of his guilt in an administrative appeal

process.  Compl. at 6; Dkt. No. 16-3 at 78.  Blackshear posited three grounds for his

appeal.[4]  See Dkt. No. 16-3 at 78–80.  First, Blackshear claimed that Woodward was

personally involved in the investigation because his name appeared on Form 2080.  Id. at

---

[4]  Blackshear also appears to indicate that Sergeant Thomas's taking of the photographs of the suboxone violated his due process rights because Thomas does not appear on the chain of custody form.  See Compl. at 4; Blackshear Resp. at 5.  This point, however, appears to be more of a misunderstanding on the part of Blackshear than a legal claim.  During his Tier III hearing it was explained to Blackshear that only individuals who possess the contraband must sign the chain of custody.  See Tier III Hr'g Tr. at 64–65. Thus, because Kogut had control of the suboxone while Thomas was photographing them, there is no need for Thomas's name to appear on the chain of custody form.  See id. Even if the failure of Thomas's name to appear on Form 2080 were indicative of any error on the part of the corrections officers, it would amount to a mere harmless error, with no effect on Blackshear's constitutional rights.  See, e.g., Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991); see section II infra.

78–79.  Blackshear noted that parties involved in the investigation were unable to serve as hearing officers to any cases they had investigated.  Id. at 78.  Blackshear contended that, because Woodward's name appeared on the chain of custody form, Woodward was involved in the investigation and thus, ineligible to serve as hearing officer.  Compl. at 7.  Second, Blackshear contended that Zehr's insistence on the suboxone being tested compromised his ability to fairly evaluate the seriousness of the infraction for purposes of assigning it to a tier.   Compl. at 7–8; Dkt. No. 16-3 at 79–80.  Blackshear asserted that Zehr's involvement in the suboxone's testing left Zehr's "mind . . . compromised" and unable to properly evaluate the infraction.  Dkt. No. 16-3 at 80.  Lastly, Blackshear argued that there was insufficient evidence to conclude that the drugs found were in fact his because the drugs, while found between his bed and locker, were not found in an area he exclusively controls.  Id.  Defendant Venettozzi, as the Acting Director of Special Housing and Inmate Disciplinary Program, reviewed and denied the appeal.  Id. at 90.

### D.  State-Level Action

Blackshear filed an action against defendants on January 7, 2012 in New York State Supreme Court, Albany County, under Civil Practice Law and Rules Article 78.[5]  Dkt. No. 16-3 at 5–15; Compl. at 5.  The matter was sent to the Appellate Division, Third Department for a ruling as it pertained to a question of substantial evidence.  Dkt. No. 16-3 at 96–97.  On January 9, 2013, the July 13, 2011 disciplinary hearing was administratively reversed as a result of conversations between Albert Prack, the director of special housing

---

[5]  New York Civil Practice Law and Rules Article 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

and inmate discipline, and the Office of the Attorney General.  Id. at 101–03.  Any references to the incident were to be expunged from Blackshear's records and he was to be returned the good time credits he had forfeited as a result of the July 13, 2011 decision. See id.  On June 13, 2013, the Third Department issued a judgment dismissing Blackshear's claim, indicating that it was moot as the administrative reversal had given him "all relief to which he is entitled."  Id. at 105–06.  This action followed.

## II.  Discussion

Blackshear alleges that his Fourteenth Amendment procedural due process rights were violated when:  (1) defendant Woodward failed to afford Blackshear due process rights during the disciplinary heaing; (2) defendant Zehr failed to investigate the alleged rule infraction in an adequate and non-biased way; and (3) defendant Venettozzi failed to train, supervise, and discipline Woodward and Zehr in a manner that would protect Blackshear's rights and affirmed Woodward's decision based on insufficient evidence.  Compl. at 9–11. Although not specifically pled, Blackshear also indicates to the Court that he did not receive adequate assistance and proper protocol was not followed in testing the suboxone, both in violation of his due process rights.  Id. at 3, 4.  Blackshear seeks declaratory relief and monetary damages for the aforementioned violations.  Id. at 12.

Defendants seek dismissal of the complaint, contending that:  (1) Blackshear's liberty interests at stake are too de minimus to support a claim that his due process rights have been violated; (2) in any event, Blackshear was provided with all the process that he was due; (3) the evidence was sufficient to support Woodward's finding and Venettozzi's affirmation of Blackshear's guilt; (4) Blackshear's claims of bias on the part of Woodward

7

and Zehr do not raise triable issues of fact; and (5) Woodward, Zehr, and Venettozzi are protected from Blackshear's suit by qualified immunity.  Defs.' Mot. Summ. J. at 6–12.

## A. Legal Standard

Summary judgment may be granted by a court when the moving party has demonstrated that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(A).  The moving party bears the burden of establishing the lack of genuine issue of material fact.  Id.; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of . . . identifying [materials] which it believes demonstrate the absence of a genuine issue of material fact.").  Facts are to be considered "material" where they have the potential to affect the outcome of a case under current and applicable law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  Any ambiguities and inferences should be reconciled in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).  Similarly, all facts must be viewed in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also Scott v. Harris, 550 U.S. 372, 380 (2007) (finding that facts may only not be viewed most favorably to the non-movant when there has been shown to be no genuine issue of material fact).

It then falls to the party opposing the motion for summary judgment to demonstrate that there is a genuine issue of material fact facilitating the need for trial.  For this issue to be "genuine" it must rise above the level of casting mere doubt concerning the nature of the fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Haines v. Kerner, 404 U.S. 519, 520 (1972)

(stating that the allegations of pro se plaintiffs are to be held to "less stringent standards

than formal pleadings drafted by lawyers."); Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion;

the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at

247–48.

## B.  Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . .

deprive any person of life, liberty, or property without due process of law."  U.S. CONST.

amend. XIV § 1.  To make a claim for depravation of procedural due process, a plaintiff

must show that:  (1) they enjoyed a protected liberty interest; and (2) they were deprived of

9

that interest absent due process.  Taylor v. Rodriguez, 238 F.3d 188, 191 (2d Cir. 2001) (citing Tellier v. Fields, 230 F.3d 502, 511 (2d Cir. 2000).  It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law."  Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

### 1. Liberty Interest

An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483–84 (1995).  In Sandin, the Court held that  while segregated housing does not automatically implicate a liberty interest, it can if the inmate can establish the confinement created an, "atypical and significant hardship in relation to the ordinary incidents of prison life."  Id. at 484.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).  This standard requires a prisoner to establish that the confinement or condition was atypical and a significant hardship in relation to ordinary prison life.  See Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996).  Thus, due process claims are "reserved for prisoners enduring a hardship that is substantially more

grave" than that of the general prison population.  Welch v. Bartlett, 196 F.3d 389, 392 (2d Cir. 1999).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality.[6]  Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights."  Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).  Despite this, past courts have allowed summary judgment for defendants in cases of SHU confinement and "the cases show a consensus in this Circuit that an inmate's confinement in the SHU for 101 days or less—without further deprivation—does not constitute an atypical or significant hardship." Alvarado v. Kerrigan, 152 F. Supp. 2d 350, 355 (S.D.N.Y. 2001); see also Tookes v. Artuz, No. 00CIV4969RCCHBP, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002)[7] (collecting cases) (ninety-six days in SHU did not implicate a liberty interest); Carter v. Carriero, 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (270 days in SHU did not implicate a liberty interest).

Even when accepting the complaint as true and viewing all facts most favorably to Blackshear, it is apparent that Blackshear lacked a protected liberty interest.  Blackshear was subjected to ninety-days' confinement in SHU, below the 101 day threshold noted in Alvarado.  152 F. Supp. 2d at 355.  As Blackshear's time spent in SHU cannot alone

---

[6]  Blackshear alleges no legally significant deprivation of rights or abuses beyond his time in SHU; thus his claim that he was deprived a liberty interest must stand solely on the length of time in SHU.  See subsection II(B)(1) infra (discussion on the implications of Vasquez).

[7]  All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

implicate a liberty interest, the nature and condition of his confinement must also be considered.  <u>See</u> <u>Vasquez</u>, 2 F. Supp. 2d at 259.  Here, Blackshear only asserts that he had limited privileges while in SHU.  Such a claim falls short of establishing a liberty interest as Blackshear fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement.  <u>See</u> <u>id</u>; <u>Frazier v. Coughlin</u>, 81 F.3d 313, 317 (2d Cir. 1996) (explaining that while prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); <u>see</u> <u>also</u> <u>Alvarado</u>, 152 F. Supp. 2d at 355 (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet <u>Sandin</u> requirements).

Blackshear lacked a protected liberty interest and, thus, necessarily lacks a Fourteenth Amendment procedural due process claim.  Accordingly, defendants' motion on this ground should be granted.


## 2.  Procedural Due Process

Even assuming a liberty interest exists, Blackshear's claim must fail because he was afforded all process due to him.  It is important to note that prisoners retain the constitutional right to due process protections.  <u>See, e.g.</u>, <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974) (citations omitted) ("[Prisoners] may not be deprived of life, liberty, or property without due process of law.").  Though prisoners retain these rights, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Horne v. Coughlin</u>,

155 F.3d 26, 30 (2d Cir. 1998) (finding that prisoners have no right to a "counsel substitute" for prison disciplinary hearings).  Nevertheless, a prisoner is entitled to:  (1) advanced written notice of the charges against him; (2) a hearing with reasonable opportunity to call witness and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the hearing officer's decision, including the evidence relied upon in making said decision.  Sira v. Morton,  380 F.3d 57, 69 (2d Cir. 2004) (citations omitted); see Freeman v. Rideout,  808 F.2d 949, 953 (2d Cir. 1986) (citations omitted). Additionally, a prisoner has the right to non-counsel assistance in establishing a defense. Eng v. Coughlin, 858 F.2d 889 (2d Cir. 1988); Ayers v. Ryan, 152 F.3d 77, 81 (2d Cir. 1998); see Horne, 155 F.3d at 30.

### a.  Advanced Written Notice

An accused prisoner has the right to be provided with advanced written notice of the charge or charges he has been accused of.  Sira, 380 F.3d at 69.  Blackshear was provided with a copy of his misbehavior report, the document indicating the violation he was charged with, on July 3, 2011 at 7:10 a.m., well before Blackshear's first appearance for his disciplinary hearing on July 6, 2011 at 1:31 p.m.  Compl. at 2–3; Dkt. No. 16-3 at 30. Thus, Blackshear was provided with written notice of the charges he was accused of in advance of his hearing.[8]

Accordingly, Blackshear had advanced written notice of his charges.

---

[8]  Blackshear makes no claim that he was not provided with advanced written notice of his charges.  See Compl. at 9–11.

### b.  Opportunity to Call Witnesses and Present Documentary Evidence

An accused prisoner has the right to a hearing where he is given the reasonable opportunity to call witnesses and present documentary evidence.  Sira, 380 F.3d at 69.  In this case, Blackshear did not inform his assistant on July 5, 2011 of any witnesses he wished to call, nor did he indicate he wished to present any documentary evidence.  Compl. at 3; Dkt. No. 16-3 at 36–37, 58–59.  Blackshear's requests to his assistant were limited to the production of "evidence from inmate records" and "DNA testing on items."  Dkt. No. 16-3 at 36–37, 58–59.  Defendant Woodward, as hearing officer, received confirmation from Blackshear that he wished to call no witnesses and advised Blackshear that the hearing was Blackshear's opportunity to present any documentary evidence.  See Dkt. No. 16-3 at 58.  Additionally, when asked at his hearing if he was satisfied with his assistant, Blackshear indicated he was.  Id. at 59.

The record thoroughly supports the conclusion that Blackshear was granted a hearing with reasonable opportunity to call witnesses and present documentary evidence.[9]

---

[9]  Blackshear also makes the claim that his due process rights were violated during his hearing because he was placed in restraints.  This claim is wholly without merit.  Multiple courts in this Circuit have held that the use of restraints during a prison disciplinary hearing does not affect a violation of constitutional rights.  Randolph v. Simmons, 757 F. Supp. 2d 233, 237 (W.D.N.Y. 2010) (citing Claudio v. Herbert, No. 01-CV-0120SR, 2005 WL 327106, at *10 (W.D.N.Y. Feb. 10, 2005) ("Because plaintiff does not have a constitutional right to be present at his disciplinary hearing, he cannot claim a right to be unencumbered by mechanical restraints if physically present during his disciplinary hearing."), Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002) ("Restraints on an inmate do not violate the amendment unless they are totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain.")).

### c. Fair and Impartial Hearing Officer

Blackshear claims defendant Woodward was biased against him in serving as hearing officer and, accordingly, violated his due process rights. Compl. at 9–10. An accused prisoner has the right to have a fair and impartial hearing officer preside over his disciplinary hearing. Sira, 380 F.3d at 69. However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . ." and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487–88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

Blackshear appears to make four claims as to why Woodward was a biased hearing officer.[10] See Compl. at 10–11. First, Blackshear contends Woodward was generally biased against him in his decisions and determinations. See id. Second, Blackshear

---

[10] Blackshear also attempts to make a Fourteenth Amendment due process claim against Zehr based on bias. Blackshear claims that Zehr was biased against him by improperly tiering Blackshear's prison infraction. Compl. at 10; Blackshear Resp. at 9–10. Blackshear's charge, violating the Standards of Inmate Behavior § 113.25, can only be a Tier II or III offense. N.Y. COMP. CODES R. & REGS. tit. 7, § 270.2-113.25. Numerous New York courts have held that a violation of § 113.25 can constitute a Tier III offense. See, e.g., Edwards v. Fischer, 87 A.D.3d 1328, 1329 (4th Dep't 2011) (reversing on grounds other than § 113.25 being considered a Tier III offense); Mingo v. Ercole, 44 A.D.3d 666, 666 (2d Dep't 2007) (accepting without comment § 113.25 being considered a Tier III offense). As a result, Blackshear's potential Fourteenth Amendment claim against Zehr based on categorizing the prison infraction as a Tier III offense must fail.

claims Woodward was involved in investigating Blackshear's alleged violation and, as such, was inherently compromised by a conflict of interests. See id. Blackshear's third claim is that Woodward demonstrated bias by imposing a harsh punishment unsupported by the evidence. See id. The final claim made is that Woodward violated Blackshear's due process rights when he found Blackshear guilty absent sufficient evidence.[11] See id.

Blackshear first alleges that defendant Woodward was generally biased in failing to view facts in a neutral manner. See id. This claim is not supported by the record. The Tier III hearing transcript indicates quite the opposite, with Woodward taking numerous precautions for the benefit of Blackshear. See, e.g., Tier III Hr'g Tr. at 58–61. Woodward began the hearing by reviewing numerous facts with Blackshear for confirmation. See id. When Blackshear complained to Woodward that he did not receive all of the documents he requested through his assistant, Woodward provided them to him as well as adjourned the hearing for one week to allow Blackshear to review them, despite Woodward's belief that they were irrelevant.[12] See id. at 60–68. Furthermore, upon resuming the hearing, Woodward asked two witnesses questions that Blackshear had raised in an effort to remove lingering confusion. See id. at 68–73. This was done even though Blackshear had no constitutional right to pose questions to witnesses. See Wolff, 418 U.S. at 567–68 (stating that "it does not appear that confrontation and cross-examination are generally

---

[11]  Blackshear makes a similar complaint against Venettozzi, arguing that Venettozzi affirmed Woodward's finding absent a sufficient level of evidence supporting the finding of Blackshear's guilt. Compl. at 11.

[12]  Blackshear's complaint that he had not received all documents requested came after he confirmed to Woodward that he was satisfied with his assistant. Tier III Hr'g Tr. at 59.

required [for prison disciplinary hearings] and "that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination."). The record thus does not support a finding that Blackshear was prejudiced by Woodward being a biased hearing officer, but, rather, that Woodward afforded Blackshear more latitude than Blackshear was legally entitled to.

Blackshear's second claim concerning Woodward's bias is that Woodward was involved in the investigation of the incident and thus, had a conflict of interest which prevented him from serving as hearing officer. Blackshear bases this claim on the appearance of Woodward's name on Form 2080 for the suboxone found near Blackshear's bed. Blackshear contends that by being in possession of the suboxone, Woodward was involved in its related investigation. Blackshear asserts that Woodward thus violated N.Y. Comp. Codes R. & Regs. tit. 7, § 254.1 which provides, in relevant part: "The following persons shall not be appointed to conduct the proceeding: . . . a person who has investigated the incident." Blackshear's argument hinges on whether or not being in physical possession of contraband constitutes "investigating" the contraband. It should be noted that, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias." Rodriguez v. Selsky, No. 09:07-CV-0432(LEK/DEP), 2011 WL 1086001, at *11 (N.D.N.Y. Jan. 25, 2011) (citing Vega v. Artus, 610 F. Supp. 2d 185, 200 (N.D.N.Y. 2009)). Here, Woodward's conduct—possession the contraband—cannot be said to rise to the level of "investigation," but is merely tangential involvement. See Vidal v. Goord, 273 A.D.2d 535, 535 (2000) (finding that the signature of a hearing officer at the bottom of a disbursement form did not constitute "investigation"). As Woodward only appeared on the chain of custody form as a result of his need to

remove the suboxone from the drop box in order to have them transported to a pharmacist for testing, his involvement was merely tangential and does not rise to the level of evidencing bias. See Rodriguez, 2011 WL 1086001 at *11. Thus, the record does not support a finding that Woodward investigated Blackshear's case.

Blackshear's third claim regarding Woodward is that Woodward was not a fair and impartial hearing officer because he imposed an unduly harsh punishment. Dkt. No. 16-3 at 7, 9–13. Contrary to Blackshear's assertion, the punishment imposed by Woodward does not run afoul the Sandin test for being an "atypical and significant hardship in relation to the ordinary incidents of prison life." See subsection II(B)(1) supra (discussing how Blackshear's punishment of ninety-days' SHU confinement is not an "atypical and significant hardship in relation to the ordinary incidents of prison life"). By not violating the Sandin test, Woodward's recommended punishment does not support the conclusion that he was not a fair and impartial hearing officer.

Lastly, Blackshear claims his due process rights were violated when Woodward found him guilty of the alleged violation. Compl. at 9. A similar claim is made against defendant Venettozzi. Blackshear argues that there was insufficient evidence for Venettozzi to affirm Woodward's finding of guilt. Id. at 11. As a prison disciplinary hearing is not a formal criminal proceeding, accused prisoners are not afforded the same rights. See Wolff, 418 U.S. at 556. Instead, due process requirements are fulfilled when there is some evidence of the inmate's guilt. Luna, 356 F.3d at 487–88. The record indicates that Woodward found Blackshear guilty in part because of the location of the suboxone between two areas of his control, his locker and his bed. Tier III Hr'g Tr. at 60–61, 74. This undisputed fact provides sufficient evidence for a finding of guilt as it provides "some evidence" of

Blackshear's guilt.  See Luna, 356 F.3d at 487–88.  Similarly, in reviewing the record, Venettozzi was justified in affirming that finding on administrative appeal for the same reasons.  See id.  Accordingly, defendants Woodward and Venettozzi did not violate Blackshear's due process rights because they had sufficient evidence to support the finding of guilt.

Contrary to Blackshear's assertion, the record does not support the claim that Woodward was not a fair and impartial hearing officer.  Woodward did not fail to view facts in a fair and neutral manner, nor did he investigate the incident or impose an atypical punishment.  Similarly, there was ample evidence to support a finding of guilt.  As such, defendant Woodward did act as a fair and impartial hearing officer and did not deprive Blackshear of his constitutional rights.

### d.  Written Statement of Decision

An accused prisoner has the right to a written statement of decision, including a statement of the evidence relied upon by the hearing officer.  Sira, 380 F.3d at 69.  In this case, Blackshear does not allege, nor does the record support, a claim that he was not provided with such a written statement of Woodward's decision.  See Dkt. No. 16-3 at 73–75.  In his decision, which he read aloud on-the-record, Woodward stated that to make his decision, he relied upon the written report of Maitland, the verbal testimonies of Blackshear and non-parties Kogut and Goodnough, Form 2080, and the photograph of the suboxone.  Id. at 73–74.  As Blackshear did not allege, nor does the record indicate, that Blackshear was not provided with a copy of this written report, including the evidence relied

upon by Woodward, the notion that this prong of the <u>Sira</u> test was not met is without merit.

Accordingly, Woodward acted as a fair and impartial hearing officer and did not deprive Blackshear of his constitutional rights.

### e. Pharmacological Analysis of Suboxone

Although inartfully alleged, Blackshear seems to state that his due process rights were violated when Woodward allowed evidence of the suboxone to be used where the suboxone was not tested in accordance with Directive 4938. <u>See</u> Compl. at 4; Tier III Hr'g Tr. at 62–64. The record however, indicates that the proper protocol was used, allowing for the reliance on the suboxone as evidence. <u>See</u> Dkt. Nos. 16-3 at 42; 22-4 at 6. Directive 4983, § 1010.4 outlines the procedure to be used when testing contraband drugs. <u>See</u> Dkt. No. 22-4 at 6. It provides, in relevant part: "If the substance is in tablet or capsule form, it shall be inspected at the facility pharmacy for possible identification." <u>Id.</u> Only if the substance cannot be conclusively identified at the pharmacy will another test be implemented. <u>See id.</u> In this case, Pharmacist Goodnough was able to conclusively identify the substance as suboxone. Dkt. No. 16-3 at 42; <u>see</u> Dkt. No. 22-4 at 6. As a result, there was no need to undertake another type of test, including the chemical test sought by Blackshear. <u>See</u> Dkt. No. 22-4 at 6; Compl. at 4; Tier III Hr'g Tr. at 62–64.

As Directive 4983 was strictly adhered to, Blackshear's procedural due process rights were not violated.

### f. Adequacy of Assistance

Blackshear also contends that his due process right was violated because he was not afforded the benefit of sufficient assistance, claiming that "[n]o other evidence [beyond a photograph of the suboxone,] [Blackshear] asked his assistant for was given, nor did the assistant ever appear to assist [Blackshear]." See Dkt. No. 1 at 3. The Second Circuit has explained that:

> the assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing.

Horne v. Coughlin, 155 F.3d 26, 29 (2d Cir. 1998) (citing N.Y. COMP. CODES R. & REGS. § 251–4.2). The assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. Lewis v. Johnson, No. 08-CV-482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5. 2010) (citing Silva, 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.'" Clyde v. Schoellkopf, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (citing Pilgrim v. Luther, 571 F.3d 201, 206 (2d Cir. 2009)).

A review of the record yields no indication that Blackshear was not adequately assisted. As Blackshear had initially indicated he was satisfied with the assistance he received, his claim must logically come from some failure of his assistant discovered during the hearing. See Dkt. No. 16-3 at 59. During his hearing, Blackshear contended that a document he had requested had not been provided to him by his assistant. Id. at 65. Even accepting

that Blackshear had indeed made this request, it amounts to a harmless error because defendant Woodward provided the document to Blackshear and adjourned the hearing to give Blackshear time to review the document and formulate a defense.[13] Id. at 68; see Clyde, 714 F. Supp. 2d at 437.

As Blackshear was afforded all assistance he had requested and any assistance he did not receive amounted to harmless error, none of Blackshear's due process rights can be said to have been violated by inadequate assistance.

### g. Failure to Investigate

While inartfully alleged, Blackshear indicates that his due process rights were violated by Zehr's failure to further investigate the origin of the suboxone. See Compl. at 10. Blackshear alleges that the mere fact that the suboxone was found near his possessions is not enough to confirm his guilt for possession of suboxone. Tier III Hr'g Tr. at 61–62. Thus, Blackshear seems to assert the claim that Zehr erred by failing to investigate any other potential origins of the suboxone. See id.; Compl. at 10. This argument, however must fail. A prison disciplinary hearing is not a formal criminal proceeding and thus, the accused lack the same protections which would be afforded to them in a criminal matter. See subsection II(B)(2) supra discussion of Wolf and Horne. Among the distinctions between the two proceedings, a prison disciplinary hearing's burden of proof is not beyond

---

[13] The notion that the assistant's failure to provide the DNA testing Blackshear had requested is also without merit. The onus to provide the testing fell to Woodward who determined it was unnecessary, presumably because any potential results of the testing would have no impact on his decision. See Tier III Hr'g Tr. at 67–68 (Woodward explaining his initial decision to not provide Blackshear with another piece of evidence was because Woodward would not be using it to make his decision).

a reasonable doubt, but a much lower standard requiring only reliable evidence of a prisoner's guilt. <u>Luna</u>, 356 F.3d at 487–88. Accordingly, Zehr was not required to undergo additional investigation to further establish Blackshear's guilt—or, as Blackshear asserts, potentially exonerate him—as Zehr had already discovered evidence sufficient for a finding of guilt. <u>See id.</u> As Zehr conducted an adequate investigation, Blackshear's claim to the contrary is without merit.

Blackshear was afforded all process he was due during all phases of his proceedings—investigation, hearing, and administrative appeal—and, thus, Blackshear necessarily lacks a claim that his Fourteenth Amendment procedural due process rights were violated. Accordingly, defendants' motion on this ground should be granted.

## C. Failure to Train and Supervise

Blackshear claims that Venettozzi violated his due process rights when Venettozzi failed to adequately train, supervise, and discipline his employees in such a way as to prevent the unfairness and bias that Blackshear claims plagued his hearing and violated his due process rights. Compl. at 11. As discussed <u>supra</u>, the record shows no evidence of any violations of Blackshear's due process rights by any of Venettozzi's subordinates. Accordingly, Blackshear's claim that Venettozzi is vicariously liable for these violations must necessarily fail and defendants' motion on this ground should be granted.

## D. Qualified Immunity

Defendants contend that even if Blackshear is found to have a legitimate Fourteenth

Amendment claim, they are protected from civil liability by the doctrine of qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Blackshear's Fourteenth Amendment claims against these defendants because, as discussed supra, it has not been shown that defendants violated Blackshear's Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.


### III. CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

summary judgment (Dkt. No. 16) be **GRANTED** as to all claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 17, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge